**Sylvester J. VAUGHNS, Jr., et al., Plaintiffs,**

**v.**

**BOARD OF EDUCATION OF PRINCE GEORGE'S COUNTY, et al., Defendants.**

**NATIONAL ASSOCIATION FOR the ADVANCEMENT OF COLORED PEOPLE, et al., Plaintiffs,**

**v.**

**BOARD OF EDUCATION OF PRINCE GEORGE'S COUNTY, et al., Defendants.**

**Civil Nos. PJM 72–325, PJM 81–2597.**

United States District Court, D. Maryland.

Oct. 11, 1996.

Patricia A. Brannan, George H. Mernick, III, and Thomas J. Henderson, Washington, DC, for Plaintiffs.

Roger C. Thomas, Andrew W. Nussbaum, Greenbelt, MD, and Sean D. Wallace, Upper Marlboro, MD, for Defendants.

### *OPINION AND ORDER*

MESSITTE, District Judge.

### I. INTRODUCTION

The Court considers the Motion of the Prince George's County Board of Education

("Board") for Leave to Modify its Magnet School Administrative Guidelines for 1996–97. Subject to the following findings of fact and conclusions of law, the Court has determined to GRANT the motion.

## II. FINDINGS OF FACT

### A. Summary of Procedural History

1. The latest phase of these proceedings was initiated on July 1, 1996, when Plaintiffs filed a Motion for Scheduling Order in response to media reports that for the upcoming school year the Board intended to admit students to Prince George's County magnet school programs outside of the racial admission guidelines that govern magnet school admissions under this Court's desegregation orders.

2. On July 8, the Court issued a scheduling order requiring the Board to file a Motion for Leave to Modify its Magnet School Admission Guidelines for 1996–97. The Board filed its motion on July 18. Plaintiffs filed their response on July 26 and the Board replied on August 2. A hearing was held on August 9.

3. At the hearing, the parties submitted extensive affidavits and depositions as well as documentary evidence. Counsel have also submitted proposed findings of facts and conclusions of law.

### B. Board Procedures in Adopting Resolution # 386–96

4. Since the 1985–1986 School Year, the Prince George's County School System has operated a number of magnet school programs. These programs were established and implemented pursuant to the Court's Orders and the parties' Memorandum of Understanding concerning the desegregation of schools in the County. Guidelines for enrollment into the magnet school program were established by the district as the program was implemented. When the magnet school program was implemented in the 1985–86 school year, each magnet school was evaluated to determine the number of seats available and the number of "black" students and "other" students who should be placed in that school in order to bring and maintain the school within the flexible guidelines. A re-evaluation of each school has been conducted by the district on an annual basis to determine the appropriate number of students to be admitted into each magnet program and the racial percentage to be applied to enrollment.

5. The district currently operates 16 different magnet school programs in 53 different magnet schools. As of September 29, 1995, there were approximately 26,516 students in the magnet schools, of whom 19,617 were African–American and 6,899 were other races.

6. It is projected that for the 1996–97 School Year, the African–American enrollment in elementary schools will be approximately 71.9%, for middle schools approximately 75%, and for high schools 74.9%.

7. The overall number of applicants for enrollment in the magnet schools is greater than the number of spaces available for students. Students are not placed into magnet programs either because no space is available for those students or because the racial guidelines prohibit the enrollment of certain students based upon their race. For the 1995–1996 School Year, there were approximately 4,558 students on waiting lists for various magnet programs, including approximately 448 non–African–American students.

8. In September 1995, the Director for Pupil Accounting and School Boundaries submitted data to Board members indicating the possibility that students on waiting lists for magnet programs would not be able to be placed in the fall of 1996 within the desegregation guidelines. The Board responded to this report by directing the Superintendent to examine the issue of magnet recruitment.

9. On September 28, 1995 two Board members introduced a resolution by which the Board would agree to seek authorization from the Court to grant admission to magnet programs to students who fell outside of the racial guidelines; would direct the Superintendent, appropriate staff, and Board Counsel to consult with the class action plaintiffs in the present litigation regarding the proposed modification to the desegregation plan prior to seeking authorization from the

Court; and would invite, as part of this consultation, to join with the Board in seeking authorization to modify the desegregation plan as proposed by the resolution.

10. The Board discussed the proposed resolution on admission guidelines during the 1995–96 school year at Board meetings held on September 28, 1995; October 12, 1995; October 26, 1995; March 28, 1996; April 25, 1996; and finally on June 17, 1996.

11. From September 1995 until May 1996, all versions of the resolution publicly debated by the Board stated that the consent of the Court would be sought before any exceptions to the guidelines would be made.

12. On October 26, 1995, the Board voted to amend the initial resolution to include a provision to the effect that the Board would take action on the admission guidelines issue only after the Superintendent and the Community Advisory Council on Magnet and Compensatory Programs ("C.A.C.") determined that the public schools had done everything reasonably possible to recruit participation in magnet programs consistent with the Court–ordered guidelines and so reported to the Board.

13. On February 28, 1996, C.A.C. passed the following motion:

The Community Advisory Council believes that the Prince George's County Public School System has *not* done everything reasonably possible to recruit participation in magnet programs consistent with court-ordered guidelines. Nevertheless, the Community Advisory Council believes the Board should go forward with its invitation to the plaintiffs to join with them in seeking authorization to modify the desegregation plan as proposed in the resolution.

14. At the Board meeting on March 28, 1996, Board members introduced a new resolution with respect to the magnet school program admission guidelines. The new proposed resolution did not contain a provision requiring the Board to consult C.A.C.

15. At the May 23, 1996 Board meeting the Chairman of the Board, Marcy Canavan, introduced an amendment that deleted the portions of the Resolution providing that the Board would seek authorization from the

Court; that the Superintendent would consult with the class action plaintiffs; and that the plaintiffs should be invited to join the Board in seeking authorization to modify the desegregation plan as proposed in the resolution. The Board adopted the amendment. A second amendment to the resolution, which the Board also adopted, provided that when there are spaces available in magnet programs which cannot be filled due to the desegregation guidelines, students will be taken off the magnet waiting list and offered enrollment in those available slots regardless of race; and that Superintendent will brief the Board at the September 5, 1996 Board meeting, on measures taken to improve magnet recruitment beginning with students to be admitted for the 1997–98 school year.

16. On June 17, 1996 the Board decided by a vote of 5 to 4 to adopt Resolution # 386–96. In its final form, the Resolution does not include any provision requiring the Board to seek approval from the Court before placing students outside of the racial admission guidelines ordered by the Court or to consult with Plaintiffs. The final version of the Resolution resolves that students will be taken off the magnet waiting list and offered enrollment in available slots regardless of race when there are spaces available in the programs which cannot be filled due to the desegregation guidelines; that the Superintendent will brief the Board on measures taken to improve magnet recruitment before students are admitted outside the desegregation guidelines beginning with students to be admitted for the 1997–98 school year; that the Superintendent will bring a plan to the Board of Education to increase magnet recruitment for the 1997–98 school year by September of 1996; and that the Board's attorney will include a summary of the Board's action as an amendment to the semi-annual report filed with the Court.

17. Throughout its consideration and eventual adoption of the Resolution, the Board expected that as many as 500 students might be placed outside of the admission guidelines if the Resolution were passed. The Chairman of the Board considered the Resolution to be the equivalent of the Board changing school boundaries.

18. Board staff determined that as of August 8, 1996 six (6) TAG magnet elementary schools, one (1) French Immersion elementary school, one (1) TAG middle school, three (3) math/science middle schools, one (1) academic center middle school and one (1) visual and performing arts high school for a total of 13 schools, would be affected by the implementation of the Resolution. Approximately 330 African–American students would be admitted to magnet programs pursuant to the Resolution.

19. Although each of the 13 schools would increase in its African–American student population, the largest increase would be 1.8% at Nicholas Orem Middle School, which would increase from 69.2% African–American to 71.0%. The increase in all the other schools would range from .1% to 1.0%.

## C. *Recruitment Efforts*

20. The Director of Magnet Schools in the Prince George's County public school system is Susan B. Miller, who is responsible for managing program operations, mentoring magnet schools in order to improve existing programs, developing new program themes, serving as a liaison between the Board of Education and the C.A.C., recruiting students for magnet programs and acting as a liaison with the community and other School System offices regarding admission to and enrollment in magnet schools.

21. Ms. Miller's office consists of herself and three secretaries. The office has no budget specifically designated for magnet school recruitment. In the two years she has been in office, Ms. Miller has neither requested nor received an increase in her overall budget for recruitment purposes.

22. In addition to the administrative magnet office, each school is staffed with a coordinator who reports to Ms. Miller and the school-based administrator.

23. Since the inception of the magnet schools program, the district has printed a brochure describing the various programs and the process for applying for admission to those programs. From school years 1986–87 to 1990–91, brochures were mailed to all residents of Prince George's County. Although brochure mailing was eliminated after the 1991–92 school year, purportedly because of budgetary constraints, the brochures are now distributed at each of the public schools as well as in public libraries throughout the County. The most recent brochure was distributed for the 1996–97 school year.

24. The district held education fairs for the 1987–88 school year through the 1993–94 school year. These education fairs were intended to provide county residents with information regarding programs within the entire school system, including the magnet programs. Magnet school program displays were presented at the education fairs. The fairs were eventually eliminated because the district was of the opinion that they were no longer serving the purposes for which they were originally intended.

25. Magnet school open houses have been held annually since 1985. Each magnet school has an open house which interested parents and students are encouraged to attend in order to receive information about the operation of the school's program. The open houses are advertised through the distribution of information at each public school in the county, at public libraries and on Prince George's County Public School Cable Channel 12.

26. In addition to county-wide recruitment efforts, individual program recruitment efforts have been undertaken by individual magnet schools. In the middle schools and high schools, recruitment has also undertaken by so-called "articulation meetings", at which personnel from the middle schools meet with parents of students attending elementary schools in order to describe program options for the middle schools. Similarly, staff from high schools meet with parents of middle school students to describe program options available at the high school level. At the meetings, students and parents are invited to apply for enrollment in the magnet programs at the middle or high school level as appropriate. All concerns from the magnet school's office and individual magnet programs regarding recruitment efforts are brought to the Magnet Steering Committee for discussion and advice. The Committee is comprised of repre-

sentatives from the Superintendent's office and administrators who have direct responsibility for magnet schools.

27. The visual and performing arts magnet at Suitland High School is advertised and promoted through showcase performances given once a year. All middle school students are invited to attend the performances. In addition, the Suitland High School performance travels to middle schools in the northern end of the County in order to provide recruitment efforts to middle school students located there. In the Talented and Gifted (TAG) magnets, written notices and information about the programs are sent to parents of all newly identified talented and gifted students.

28. Recruitment efforts are also initiated by staff of the magnet school office. Staff presents information to community organizations, at education fairs sponsored by local organizations and frequently speaks at meetings where parents of school-age children may be in attendance. In February of 1995, the magnet school office produced a video describing magnet school options and the process for application and enrollment in these programs. The video was shown throughout the month of February and March on public school cable channel, has been made available to community groups and local schools, and is shown at open houses.

29. The magnet office has begun to focus its attention on improving recruitment efforts in certain schools clustered in particular geographic areas where there has been an under-enrollment of non–African–American students. Letters have been sent or communication made with students identified as talented and gifted in their local comprehensive program who are currently not on waiting lists for TAG programs encouraging their application for possible vacancies and enrollment.

30. On the other hand, the district does not have a process by which school personnel are held accountable for the success or lack of success of magnet recruitment efforts. The efforts of local schools to do their own recruitment apart from the magnet school program's central office are not considered in the evaluation of any local school-based personnel. Moreover, the Director for Magnet School Programs is not evaluated with regard to her efforts in magnet school recruitment.

31. The district has never had a policy of targeting private schools within the County for recruitment into magnet programs. The Director for Magnet School Programs sends information on the programs to private schools only upon request.

32. The district placed no advertisements for the magnet school programs in local newspapers for the 1995–96 school year. No specific effort over the last school year was directed toward individual magnet programs which had been noted as having difficulty in obtaining sufficient non–African–American enrollment.

33. On March 28, 1996, C.A.C. submitted recommendations to the Board which identified key areas within the magnet program needing increased attention and support. The C.A.C. recommended, *inter alia*, an assessment of the market for the magnet offerings; development and implementation of a marketing strategy based on the market assessment; implementation of targeted recruiting/marketing program effectiveness studies and measurements; communication to parents and C.A.C. at the earliest possible times regarding changes affecting magnet programs; and establishment of a mechanism or process for dealing with specific problems which may occur. It remains to be seen what actions, if any, the Board and the district will take with regard to the C.A.C. recommendation.

34. Notwithstanding the foregoing, the district has not recruited a sufficient number of non–African–American students to fill all available vacancies in the magnet schools. In the 1985–86 School Year, when the magnet programs were initially developed, there were 41,655 non–African–American students, 40.4% of the total student enrollment. For the 1995–96 School Year, there are approximately 33,810 non–African–American students are enrolled in the system, or 28.2%. There has been a total loss of 7,845 non–African–American students, 18.8%, which has

584

unquestionably made it more difficult to place non–African–American students · in magnet programs and keep the percentage number of students required to fill vacancies under the desegregation guidelines. Simultaneously, the enrollment of African–American students has increased from 61,342 to 86,141, representing a gain of 24,799 (40.4%) in African–American students. In addition, demographic changes appear to have affected the recruitment efforts for students in the magnet school program in some parts of the county as compared to others.

35. Other reasons that may account for the Board and district's lack of greater success with the magnet schools remain to be explored.

### III. CONCLUSIONS OF LAW

 A. The Board was obligated to seek Court approval before placing students in magnet programs without regard .to the admission guidelines set by this Court. The Court (Kaufman, J.) was clear about this on a previous occasion. The Board lacks authority to unilaterally implement student assignment changes when the effect will be segregative. *Vaughns v. Bd. Of Educ. Of Prince George's County,* 574 F.Supp. 1280, 1337 (D.Md.1983). While the Memorandum of Understanding between counsel for Plaintiffs and counsel for the Board provides that the 10–80% racial admission .guidelines are to be flexibly administered, this does not authorize the Board to determine for itself to abandon the guidelines. As Judge Kaufman observed "All guidelines should be recognized only as such and should be flexibly administered ·by the School Board *and by this court,* as and when required." *Id.* At 1375 (emphasis added). The Board's action in this instance went beyond the meaning of "flexibility" and required Court approval.

B. The Board's action · seriously limited the opportunity of the Court and Plaintiffs to engage in adequate meaningful review. However, it does not appear that significant harm to the course of desegregation in the County will result from the admission of the 330 · students · identified by the Board to the magnet program of their choice for the present school year. The

Court will therefore approve the admission of these students to the programs of their choice.

C. ·The Court's approval for admission of students in the magnet program outside the admission guidelines is limited as follows:

1. The· exceptions to the guidelines sought by the Board are approved as to the 1996–97 school year only.

2. The.Board shall provide a monthly report to the Court and Plaintiffs of any proposed student admissions outside of the guidelines, in addition to the 330 students identified by the Board effective August 8, 1996.

3. The Board shall take immediate affirmative action to contact the parents of non-African-American students who remain on waiting lists for magnet programs, because they could not be placed in the specific programs for which they applied and shall encourage those students to apply for and seek enrollment in alternative magnet or other programs for which they might be eligible for admission.